1    KELLEY DRYE & WARREN LLP
     Tahir L. Boykins (State Bar No. 323441)
2    10100 Santa Monica Boulevard, 23rd Floor
     Los Angeles, CA 90067-4008
3    Telephone:   (310) 712-6100
     Facsimile:    (310) 712-6199
4    tboykins@kelleydrye.com
     Attorneys for Defendants
5

6    KELLEY DRYE & WARREN LLP
     Lauri A. Mazzuchetti (*pro hac vice*)
     Geoffrey W. Castello (*pro hac vice*)
7    One Jefferson Road, 2nd Floor
     Parsippany, New Jersey 07054
8    Telephone: (973) 503-5900
     Facsimile: (973) 503-5950
9    lmazzuchetti@kelleydrye.com
     gcastello@kelleydrye.com
10

11    *The Häagen-Dazs Shoppe Company, Inc.,*
     *Nestlé Dreyer's Ice Cream Company, and Nestlé USA, Inc.*

12                  **UNITED STATES DISTRICT COURT**

13               **NORTHERN DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| 15   MELANIE G. SAN PEDRO-SALCEDO, individually, and on behalf of all others similarly situated, | Case No. 5:17-cv-03504-EJD |
| 16 | **DEFENDANTS NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| 17 | |
| 18             Plaintiff, | |
| 19       v. | DATE: OCTOBER 10, 2019
TIME: 9:00 A.M.
COURTROOM: 4, 5TH FLOOR |
| 20   THE HÄAGEN-DAZS SHOPPE COMPANY, INC., a New Jersey corporation; NESTLÉ DREYER'S ICE CREAM COMPANY, a Delaware corporation; NESTLÉ USA, INC., a Delaware corporation; and DOES 1 through 50, | |
| 21 | |
| 22 | |
| 23           Defendants. | |

24

25              <u>**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**</u>

26

27

28

4835-6507-6124V.1

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

   **PLEASE TAKE NOTICE** that on October 10, 2019 at 9:00 a.m., or as soon thereafter as the parties may be heard, before the Honorable Edward J. Davila, U.S.D.J., Courtroom 4, 5th Floor, 280 South 1st Street, San Jose, California, 95113, defendants The Häagen-Dazs Shoppe Company, Inc., Nestlé Dreyer's Ice Cream Company and Nestlé USA, Inc. ("Defendants") will and do move the Court pursuant to Federal Rule of Civil Procedure 56, Civil L. R. 56, 7-2 and 7-3, and this Court's Standing Order for Civil Cases V(C).

   As discussed more fully in the attached Memorandum of Points and Authorities, Defendants bring this motion for summary judgment based on the unrebutted facts and Plaintiff's admissions in this matter that the text message that Plaintiff complains of in her Complaint (i) does not constitute advertising and therefore Plaintiff consented to receive the text message; and (ii) because the platform that sent the text message at issue is not an automatic telephone dialing system.  Because both elements are required to sustain a cause of action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), Plaintiff cannot prove a violation of the TCPA.  In addition, there is no evidence in the record that either Nestlé Dreyer's Ice Cream Company or Nestlé USA, Inc. were involved with, controlled, or were even aware of the text that Plaintiff complains about.  As such, Defendants request that the Court grant summary judgment in their favor on all counts and claims asserted in the Complaint.

   Defendants' motion is motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently-filed Declaration of Jennifer McLean, Declaration of Michael S. Levitz, Declaration of Matthew Bishop, Declaration of Geoffrey W. Castello and Defendants' Separate Statement in Support of Their Motion for Summary Judgment, any additional evidence or briefing on this subject that may be requested by the Court or submitted under the rules and the complete files and records in this matter, and such additional matters as the Court may consider.

   This motion is made following the conference of counsel pursuant to Court's Standing Order for Civil Cases V(C), which took place on July 8, 2019.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED: July 9, 2019

KELLEY DRYE & WARREN LLP
Tahir L. Boykins
Lauri A. Mazzuchetti (*pro hac vice*)
Geoffrey W. Castello (*pro hac vice*)


By   /s/ *Tahir L. Boykins*
        Tahir L. Boykins (State Bar No. 323441)

*Attorneys for Defendants*
*The Häagen-Dazs Shoppe Company, Inc.,*
*Nestlé Dreyer's Ice Cream Company, and*
*Nestlé USA, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page(s)**

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND .............................................................................. 2

 A. Plaintiff's Experience at Häagen-Dazs ................................................. 2

 B. The Häagen-Dazs Rewards Program ..................................................... 5

 C. The Text Platform Did Not Create or Store Phone Numbers, And Could Not Send Text Messages Automatically Without Human Intervention; Texts Could Only Be Sent One At A Time ...................... 8

 D. Neither Nestlé Nor Dreyer's Had Any Involvement In or Control of The Text ................................................................................................ 9

III. PROCEDURAL HISTORY ............................................................................... 9

IV. LEGAL STANDARD ...................................................................................... 10

V. ARGUMENT .................................................................................................... 10

 A. Overview of Plaintiff's Claim and the Issues Before the Court ........... 11

 B. The Undisputed Facts Demonstrate That Plaintiff Consented to the Text ........... 12

  1. The Text Message Was Not Advertising or Telemarketing ..................... 13

  2. Plaintiff's Admission That She Provided Prior Express Consent To Receive The Text Message At Issue Is A Bar To Her Claim ............. 19

 C. The Undisputed Facts Demonstrate That Häagen-Dazs  Did Not Use an ATDS to Text Plaintiff .......................................................................... 20

  1. The Platform Does Not Generate or Store Numbers To Be Called ........ 21

  2. The Platform At Issue Here Cannot Dial Numbers Automatically .......... 22

 D. Nestlé and Dreyer's Are Entitled to Summary Judgment ..................... 24

CONCLUSION .............................................................................................................. 25

i

1

## TABLE OF AUTHORITIES

2

**Cases** **Page(s)**

3

*Addisu v. Fred Meyer, Inc.*,
4
   198 F.3d 1130 (9th Cir. 2000) ............................................................................. 10

5
*Aderhold v. car2go N.A. LLC*,
   668 F. App'x 795 (9th Cir. 2016) ................................................................... 13, 16
6

7
*Aderhold v. Car2go N.A., LLC*,
   No. C13-489RAJ, 2014 WL 794802 (W.D. Wash. Feb. 27, 2014), *aff'd*, 668 F.
8
   App'x 795 (9th Cir. 2016) ............................................................................. 17, 19

9
*Alleman v. Yellowbook*,
   No. 12-cv-1300-DRH-PMF, 2013 WL 4782217
10
   (S.D. Ill. Sept. 6, 2013) ......................................................................................... 19

11
*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................... 10
12

13
*Barnes v. Arden Mayfair, Inc.*,
   759 F.2d 676 (9th Cir. 1985) ................................................................................. 10

14
*Celotex Corp. v. Catrett*,
15
   477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ...................................... 10

16
*Daniel v. Five Stars Loyalty, Inc.*,
   No. 15-cv-03546-WHO, 2015 WL 7454260 (N.D. Cal. Nov. 24 2015) ............ 13, 15, 17
17

18
*Duguid v. Facebook, Inc.*,
   ---F.3d ----, 2019 WL 2454853 (9th Cir. June 13, 2019) ...................................... 22

19
*Duran v. La Boom Disco, Inc.*,
20
   369 F. Supp. 3d 476 (E.D.N.Y. 2019) ................................................................... 24

21
*Ellis v. Phillips and Cohen Associates, Ltd.*,
   No. 14-cv-05539-EJD, 2016 WL 3566981 (N.D. Cal. Jun. 30, 2016) .................. 21
22

23
*Ewing v. Encor Solar, LLC*,
   No. 18-CV-2247-CAB-MDD, 2019 WL 277386 (S.D. Cal. Jan. 22, 2019) .......... 25

24
*Fober v. Mgmt. and Tech. Consultants, LLC*,
25
   886 F.3d 789 (9th Cir. 2018) ....................................................................... 11, 12, 19

26
*Friedman v. Torchmark Corp.*,
   No. 12-CV-3827-IEG (BGS), 2013 WL 1629084 (S.D. Cal. Apr. 16, 2013) ....... 19

27

28

ii
DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

*Glasser v. Hilton Grand Vacations Co., LLC*,
    341 F. Supp. 3d 1305 (M.D. Fla. 2018) ............................................................... 23

*Glauser v. GroupMe, Inc.*,
    No. C 11-2584 PJH, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015) .......................... 23

*Herrick v. GoDaddy.com LLC*,
    312 F. Supp. 3d 792 (D. Ariz. 2018) .................................................................... 23

*Huricks v. Shopkick, Inc.*,
    No. C-14-2464 MMC, 2015 WL 5013299 (N.D. Cal. Aug. 24, 2015) ................... 23

*Ibey v. Taco Bell Corp.*,
    No. 12-CV-0583-H (WVG), 2012 WL 2401972 (S.D. Cal. June 18, 2012) ........... 19

*Knutson v. Blue Light Security, Inc.*,
    No.17-cv-134-LAB, 2018 WL 1172611 (S.D. Cal. Mar. 8, 2018) ......................... 17

*Luna v. Shac, LLC*,
    122 F. Supp. 3d 936 (N.D. Cal. 2015) .................................................................. 23

*MacKinnon v. Hof's Hut Restaurants, Inc.*,
    No. 2:17–cv–01456–JAM–DB, 2017 WL 5754308 (E.D. Cal. Nov. 28, 2017) .............. 17, 18

*Maddox v. CBE Grp., Inc.*,
    No. 1:17-CV-1909, 2018 WL 2327037 (N.D. Ga. May 22, 2018) ......................... 24

*Marks v. Crunch San Diego, LLC*,
    904 F.3d 1041 (9th Cir. 2018).............................................................. 21, 22, 24

*Marshall v. CBE Grp., Inc.*,
    No. 2:16-cv-02406-GMN-NJK, 2018 WL 1567852 (D. Nev. March 30, 2018) .................. 23

*Meyer v. Portfolio Recovery Assocs., LLC*,
    707 F.3d 1036 (9th Cir. 2012) ............................................................................. 12

*Pinkard v. Wal-Mart Stores, Inc.*,
    No. 3:12-cv-2902-CLS, 2012 WL 5511039 (N.D. Ala. Nov. 9, 2012) ................. 20

*Ramos v. Hopele of Fort Lauderdale, LLC*,
    334 F. Supp. 3d 1262 (S.D. Fla. 2018)................................................................. 24

*Reese v. Marketron Broad. Sols., Inc.*,
    No. CV 18-1982, 2018 WL 2117241 (E.D. La. May 8, 2018) ....................... 13, 18

*In the Matter of Rules & Regulations Implementing the TCPA*,
    30 FCC Rcd. 7961 (2015) ............................................................................. 13, 14

1

2

*San Pedro-Salcedo v. Häagen-Dazs Shoppe Company, Inc.*,
  No. 5:17-cv-03504, 2017 WL 4536422 (N.D. Cal. Oct. 11, 2017) ...................................... 19

3

*Satterfield v. Simon & Schuster, Inc.*,
  569 F.3d 946 (9th Cir. 2009) ............................................................................................. 12

4

5

*Smith v. Blue Shield of Cal. Life & Health Ins. Co.*,
  228 F. Supp. 3d 1056, 1067-68 (C.D. Cal. 2017) .............................................................. 14

6

*Suriano v. French Riviera Health Spa, Inc.*,
  Civ. No. 19-9141, 2018 WL 6702749 (E.D. La. Dec. 20, 2018) ..................................... 14, 15

7

8

*Triton Energy Corp. v. Square D Co.*,
  68 F.3d 1216 (9th Cir. 1995) ............................................................................................. 10

9

10

*Ung v. Universal Acceptance Corp.*,
  249 F. Supp. 2d 985 (D. Minn. 2017) ................................................................................ 23

11

*Van Patten v. Vertical Fitness Group*,
  22 F. Supp. 3d 1069, 1071 (S.D. Cal. 2014) ...................................................................... 20

12

13

*Van Patten v. Vertical Fitness Group, LLC*,
  847 F.3d 1037 (9th Cir. 2017) ..................................................................................... 13, 20

14

15

*Wick v. Twilio Inc.*,
  No. 16-914, 2016 WL 6460316 (W.D. Wash. Nov. 1, 2016) ......................................... 14, 18

16

**Statutes**

17

Telephone Consumer Protection Act, 47 U.S.C. § 227 ............................................................. *passim*

18

**Other Authorities**

19

47 C.F.R. § 64.1200 ........................................................................................................... 12, 13

20

30 F.C.C. Rcd. 7961 .......................................................................................................... 19, 20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1    In support of their motion for summary judgment pursuant to Fed. R. Civ. P. 56(a),

2    defendants The Häagen-Dazs Shoppe Company, Inc. ("Häagen-Dazs"), Nestlé Dreyer's Ice Cream

3    Company ("Dreyer's"), and Nestlé USA, Inc. ("Nestlé," and collectively, "Defendants") state as

4    follows:

5                                                      **I.**

6                                            **<u>INTRODUCTION</u>**

7    Plaintiff Melanie G. San Pedro-Salcedo's ("Plaintiff") asserts against Defendants a claim

8    under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), on behalf of herself

9    and a putative class.  Plaintiff's claim is based on a single text message (the "Text") that she

10   received immediately after she voluntarily provided her cellular telephone number to a cashier at a

11   Häagen-Dazs store so that she could sign up for the Häagen-Dazs customer rewards program (the

12   "Rewards Program").  Plaintiff alleges in her Complaint that the Text was sent using equipment

13   that falls within the TCPA's definition of "automatic telephone dialing system" ("ATDS") and, as

14   a result, Häagen-Dazs was required to have Plaintiff's consent "***in writing***" and not just the verbal

15   consent that Plaintiff admittedly provided to the cashier.  Notwithstanding the fact that she

16   voluntarily provided her cellular phone number to Häagen-Dazs and received only a single

17   welcome text message that was related to the Rewards Program that she affirmatively desired to

18   join, Plaintiff is seeking devastating statutory damages on behalf of herself and a putative class.

19   In order to prevail on her TCPA claim, Plaintiff must prove that the Text constituted

20   advertising ***and*** was sent using an ATDS.  The undisputed facts, including Plaintiff's own

21   admissions at her deposition – all of which are consistent with the record evidence in this action –

22   make clear that Plaintiff cannot prove either of these required elements.

23   The undisputed facts, including Plaintiff's admissions, demonstrate that the Text did not

24   constitute advertising or telemarketing.  Plaintiff admitted at her deposition that the Text did not

25   attempt to sell her anything.  Rather, the undisputed record demonstrates that the Text was a

26   welcome/enrollment message that provided Plaintiff with the means to complete the registration

27   process for the Rewards Program that she sought to join.  Thus, there is no factual basis to

28   conclude that the Text was an advertisement.

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1    Nor can Plaintiff demonstrate that the Text was sent using an ATDS.  Despite alleging in

2  her Complaint that Defendants utilized an ATDS to send the Text she complains about, Plaintiff

3  admitted at her deposition that (i) she had knowledge of technology that would qualify as an

4  ATDS independent of this action; and (ii) the Text did not come from such a device.  Plaintiff's

5  admission is entirely consistent with the platform's functionality, which operated as a manual

6  process requiring human intervention to send text messages on a one-by-one – and not an *en*

7  *masse* – basis.  Plaintiff has offered no other evidence, expert or otherwise, that conflicts as to this

8  issue.

9    To the extent that Plaintiff argues otherwise, the Court could not – and did not – consider

10  on Defendants' pre-answer motion to dismiss the facts that provide the dispositive answers to

11  these two threshold issues.  All of the evidence that addresses the two threshold issues is now

12  properly before the Court and warrants summary judgment in favor of Defendants.  There is also

13  no genuine dispute that, even if Defendants used an ATDS to send the Text (which they did not),

14  Plaintiff provided the requisite level of consent.  Plaintiff has admitted that she voluntarily

15  provided her cell phone number to the Häagen-Dazs cashier for the purpose of joining the

16  Rewards Program.  This constitutes the requisite level of "prior express consent" and summary

17  judgment in favor of Defendants should be granted.

18    Finally, while summary judgment should be granted in favor of all Defendants, there is no

19  evidence in the record that Nestlé or Dreyer's were even involved in, or had any knowledge of, the

20  Text.  Accordingly, summary judgment in their favor should be awarded.

21                                                **II.**

22                                   **FACTUAL BACKGROUND**

23  **A.    Plaintiff's Experience at Häagen-Dazs**

24    Plaintiff was a repeat customer of Häagen-Dazs and, as of April 2017, she had visited

25  Häagen-Dazs stores in the San Jose area "[o]ver a hundred times."  (Decl. of Geoffrey Castello,

26  Ex. A, Plaintiff's Deposition (hereinafter "Pl. Dep." 40:10-19)).  On April 22, 2017, Plaintiff

27  visited a Häagen-Dazs store at the Valley Fair Mall in San Jose, California.  (*Id.* at 40:20 – 41:1.)

28  After she placed her ice cream order, the cashier asked Plaintiff "[w]ould you like to be part of our

                                                2
                DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1    rewards program?"  (*Id.* at 43:13-17.)  Plaintiff responded, "yes," and the cashier asked Plaintiff

2    for her cell phone number, which Plaintiff voluntarily provided.  (*Id.* at 43:18-23.)  Within

3    minutes,[1] Plaintiff received the welcome Text that stated: "Thank you for joining Haagen-Dazs

4    Rewards!  Download our app here: http://psmkt.me/E41tfs."  (Compl. ¶ 15.)  This single Text is

5    the only text message that Plaintiff ever received from Häagen-Dazs, and is the sole basis for

6    Plaintiff's putative class action lawsuit that seeks to recover, on an aggregate basis, more than

7    $250 million.  (Pl. Dep. 28:22 – 29:12.)  Plaintiff did not download the Häagen-Dazs App (the

8    "App") from the Text.  (Pl. Dep. 33:14-19.)

9          Plaintiff conceded at her deposition that the Text she received did not attempt to sell her

10   anything.  (*Id.* at 45:13-24 (Q.: Does anything in this text message try to sell you anything?

11   [objection omitted]  A.: No.))  While Plaintiff never downloaded the App from the Text, she did

12   have personal experience with respect to its functionality and uses because she reviewed it on

13   Google Play for purposes of this lawsuit.  (*Id.* at 33:18-19; 48:17-19.)  Plaintiff testified that the

14   App itself did not contain any advertising.  (*Id.* at 48:17-19.)  Plaintiff also testified, contrary to

15   her allegation in Paragraph 15 of her Complaint, that she never saw anything on the App that led

16   her to believe it could be used to "place orders."  (Compl. ¶ 15; Pl. Dep. at 47:2-4.)

17         Plaintiff testified at her deposition that, based on experience gained through her

18   employment, she was familiar with the types of equipment that constitute an ATDS and did not

19   believe that one was used to send the Text.  (*Id.* at 67:17-21.)  Plaintiff became familiar with

20   "automatic telephone dialing systems" while she was working as a research manager in the

21   medical field, and was exploring strategies to reach out by telephone to potential survey

22   participants.  (*Id.* at 65:13-68:3.)  When asked why she did not believe that an ATDS was used to

23   send the Text, Plaintiff testified "[b]ecause I was asked for my phone number, and shortly after I

24   received a text message from the company that asked for my phone number."  (*Id.*)  Plaintiff

25   effectively explained that the Text was sent using an on-demand platform, not an ATDS capable

---

[1] Plaintiff's experience is consistent with the manner in which the platform was designed to

operate. (Pl. Dep. at 67:25-68:11; Decl. of Matthew Bishop ("Bishop SJ Decl.") ¶ 16.)

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1   of making phone calls *en masse*.  (*Id.*)  Plaintiff has offered no expert opinion to support her

2   contention that an ATDS was used to send the Text and the deadline to do so has expired.

3         To support the claim in the Complaint that the Text was sent using an ATDS, Plaintiff

4   alleged that she was "informed and believes, and based thereon alleges, that her cellular-telephone

5   number was entered into a database and that Defendant used equipment capable of storing and/or

6   producing telephone numbers, as well as capable of dialing such numbers, to send the above-

7   referenced text message to [her]." (Compl. ¶ 20.)  When asked about the basis for this allegation

8   and belief, Plaintiff incredibly testified that she believed that Häagen-Dazs or a different

9   Defendant had put her number into a database that was given to unrelated third parties, and was

10  responsible for placing approximately 12 telephone calls (not text messages) to her cell phone

11  made by unknown and unidentified entities.  (Pl. Dep. 58:22-62:12.)  In this regard, Plaintiff

12  testified as follows:

13        Q. . . . Are you suggesting that Häagen-Dazs or some other defendant gave your
      number to others?
14        A.  Yes.
      Q.  Who did they give it to?
15        A.  I don't know.
      Q.  What is the basis for that belief?
16        [objection omitted]
      The Witness:  Experience
17        Q. What experience?
      A.  When they ask for – when they asked for phone numbers, sometimes they use it
18        to give out to other companies to do marketing calls.  Sometimes they use the
      phone number for identification.
19        Q.  And is it your claim that you received telephone calls as a result of giving your
      phone number to Häagen-Dazs?
20        A.  Yes.
      Q.  When did you receive those calls?
21        A.  I'm not sure.
      Q.  Who were they from?
22        A.  I don't know.
      Q.  And are you claiming for those telephone calls in this case?
23        A.  Yes.

24  (*Id.* 59:19-60:21.)  At this point in the deposition, Plaintiff's counsel began asserting objections

25  attempting to coach the witness to say that she was claiming for a text message, not telephone

26  calls.  Plaintiff, however, did not understand the instruction and her testimony continued as

27  follows:

28        Q.  How many telephone calls are you claiming?
      A.  I'm not sure of the number.

4835-6507-6124V.1                                    4

1   Q. Can you approximate?
    A.  Twelve.

2   (*Id.* at 62:11-14.)   Plaintiff's counsel immediately called for a break over objection from

3   Defendants' counsel.   When Plaintiff's counsel later questioned Plaintiff, she changed her

4   testimony to say that the basis for the instant lawsuit is the single Text referred to in the

5   Complaint, and is not based on any other alleged calls from third parties.  (*Id.* at 83:15-84:17.)

6   Plaintiff claimed that her testimony changed because she "was confused."  (*Id.* at 84:13-17.)

7   Plaintiff did not, and could not, further support her allegations about her number allegedly being

8   "entered into a database and that Defendant used equipment capable of storing and/or producing

9   telephone numbers, as well as capable of dialing such numbers."  (*Id.* at 59:19 – 62:4; 83:15 –

10  84:17.)

11  **B.       The Häagen-Dazs Rewards Program**

12       The Häagen-Dazs Rewards Program (the "Rewards Program"), including the App, was

13  created by iMobile3, LLC ("iMobile3") in 2015, was designed to be experienced using a

14  "Passmarket" mobile application.  (Bishop SJ Decl. ¶¶ 5, 10; Decl. of Jennifer McLean ("McLean

15  SJ Decl.") ¶¶ 4-5, 9.)   The "Passmarket Participant Agreement" and "Passmarket Participant

16  Terms of Use," which constituted the agreement between Häagen-Dazs and iMobile3, confirm by

17  their express terms that the Rewards Program was based on the App.[2]  (Bishop SJ Decl. ¶ 6, Ex.

18  A; McLean SJ Decl. ¶ 4, Ex. A, at 1 (stating that "███████████████████████

19  ████████████████████████████████████████████████████████████

20  ████████████

21  _____

22  [2] Pursuant to the Participant Agreement, iMobile3 created a "turn-key" program, designing and

23  maintaining a system whereby Häagen-Dazs customers who are interested in joining the Rewards

24  Program can track rewards points and receive special offers.   (McLean SJ Decl. ¶¶ 5, 10.)

25  iMobile3 was responsible for all aspects of the Rewards Program, including creating and

26  implementing a designed a program that utilized Häagen-Dazs' point of sale cashier registers

27  ("POS") at Häagen-Dazs locations around the country.  (McLean SJ Decl. ¶¶ 5, 7.)

28

1    ████████.") (emphasis added).

2         Consistent with the Rewards Program design, cashiers at Häagen-Dazs store locations, all

3    of which are owned and operated by franchisees (McLean SJ Decl. ¶ 7), would ask customers if

4    they desired to join the Rewards Program.  If a customer responded positively, the cashier would

5    ask for the customer's mobile telephone number, and explain to the customer that he or she would

6    receive a text message that would permit them to complete the registration process by

7    downloading the App to their smart phone so that they can enjoy the full Rewards Program

8    experience.[3]  (Bishop SJ Decl. ¶¶ 8-10, Ex. C; McLean SJ Decl. ¶¶ 10-11.)  Once a customer

9    received the text message and clicked on the link to download the App, they were prompted to

10   provide their email address, birthdate, favorite Häagen-Dazs location, and favorite flavor of ice

11   cream.  Customers also created a password to manage access to their Rewards Program account.

12   Taking these steps allowed customers to earn points, track the points that they earned using the

13   App, and to receive, through the App (not by text message), rewards such as coupons and

14   discounts.  (McLean SJ Decl. ¶ 30.)  If a customer failed to set up his or her Rewards account

15   within the App, he or she could not receive special offers that were earned or available through the

16   Rewards Program.  (Bishop SJ Decl. ¶¶ 5, 9; McLean SJ Decl. ¶ 10.)  Customers who did not set

17   up their Rewards account within the App also did not have a means (other than by calling

18   Passmarket customer service) to track their Rewards points.  (*Id.*)

19        In sum, there is no dispute that the Rewards Program is designed to be utilized through the

20   App, which is the primary experience by which Rewards members may take advantage of the

21   Rewards Program.  (Bishop SJ Decl. ¶ 5; McLean SJ Decl. ¶ 10.)  The App is a crucial component

22   of the Rewards Program, and without downloading it, the customer does not have the ability to

23   fully participate in the full experience of the Rewards Program.  (McLean SJ Decl. ¶¶ 9, 10, 30;

24   Bishop SJ Decl. ¶¶ 5, 10.)  It is for this reason that downloading the App was a necessary step in

25   completing enrollment in the Rewards Program.  (*Id.*)

26   _____

27   [3] Cashiers do not receive any additional compensation or other incentive based upon customers

28   signing up for the Rewards Program.  (McLean SJ Decl. ¶ 21.)

1    Also consistent with the design of the Rewards Program, in or about 2015, iMobile3 had

2    developed materials with Häagen-Dazs that were used to train cashiers at the Häagen-Dazs

3    franchise locations.  (Bishop SJ Decl. ¶¶ 8-10, Ex. B; McLean SJ Decl. ¶ 11, Ex. B.)  These

4    materials confirmed the purpose of the one-time text message that would be initiated by the

5    cashier upon a customer's provision of his or her cellular phone number.  (*Id.*)  Specifically, the

6    training materials and a "Rewards Script" trained cashiers to say the following to customers:

7    "████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ███████████████████████████████████."  (McLean & Bishop SJ Decls.

10   Ex. B at 15.)  If the customer provided his or her telephone number to the cashier, the cashier was

11   also reminded to tell the customer at the end of the transaction that "████████████████

12   ████████████████████████████████████████████████████████████████████

13   █████████████████████████████████████████████████"[4]  (Bishop

14   SJ Decl. ¶ 9, Ex. B; McLean SJ Decl. ¶ 14, Ex. B.)

15   In addition, the Participant Terms of Use also confirm the purpose of the text message at

16   issue:

17

18   ████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████

21   _____

22   [4] Despite the training that every Häagen-Dazs cashier receives instructing them to advise

23   customers that they will receive a text message to allow them to download the App as part of the

24   enrollment process (Bishop SJ Decl. ¶ 9, Ex. B; McLean SJ Decl. ¶ 14, Ex. B), Plaintiff testified

25   that she did not receive this information.  (Pl. Dep. 27:9-10.)  Plaintiff testified that, had she

26   received the information that Häagen-Dazs cashiers were trained to provide to customers enrolling

27   in the Rewards Program, she would not have brought this lawsuit.  (*Id*. at 27:13-15.)

28

(Bishop SJ Decl. Ex. A at HD00026; McLean SJ Decl. Ex. A at HD00026) (emphasis added).

As Plaintiff admitted at her deposition, the welcome/enrollment text message sent to customers requesting to join the Rewards Program did not offer to sell anything to her or anyone else.  (Pl. Dep. 45:20-24.)  Rather, it made the Häagen-Dazs App available for download so that customers, who, like Plaintiff, desired to join the Rewards Program, could fully participate in the Rewards Program as it was designed.  Plaintiff also admitted at her deposition, that the App itself, upon downloading it, did not contain advertising.  (*Id*. at 48:17-19.)

Other than this lawsuit, Häagen-Dazs has never received a single complaint concerning a text message sent with respect to the Rewards Program.  (McLean SJ Decl. ¶ 27.)

**C.    The Text Platform Did Not Create or Store Phone Numbers, And Could Not Send Text Messages Automatically Without Human Intervention; Texts Could Only Be Sent One At A Time**

PassMarket's platform utilized an "on-demand" text message feature that allowed a cashier to initiate a text message to a cell phone number provided by a customer so that the customer could access the App and complete enrollment.  (Bishop SJ Decl. ¶ 12; McLean SJ Decl. ¶ 16.) When a customer provided his or her telephone number to a cashier at a Häagen-Dazs franchise location, the cashier manually entered that telephone number in the POS to send the welcome/enrollment Text.  (Bishop SJ Decl. ¶ 13; McLean SJ Decl. ¶ 17.)  From a technical perspective, the manual entry of the customer's telephone number by the cashier into the POS was the effective point at which the cashier sent the Text.  (Bishop SJ Decl. ¶ 14.)  The PassMarket platform used Twilio, Inc. ("Twilio") as its telephony provider to send the single, on-demand Text.  (*Id*.)  Text messages could only be sent one at a time at the initiation of a cashier, and could not be sent automatically (without human involvement), nor could they be sent *en masse*.  (*Id*.; McLean SJ Decl. ¶ 18.)  The cashier's human intervention was required for any text message, including the Text to Plaintiff, to be sent.  (Bishop SJ Decl. ¶ 16.)

The Häagen-Dazs POS does not have the capacity to store or produce telephone numbers or create either random or sequential telephone numbers.  (McLean SJ Decl. ¶ 23.)  Nor does it have the capacity to dial telephone numbers or to send text messages to telephone numbers

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

1  without human intervention.  (*Id.*)  iMobile3's PassMarket platform does not have the capacity to

2  store or produce telephone numbers to be called, or send text messages, or to create either random

3  or sequential telephone numbers.  (Bishop SJ Decl. ¶ 18.)  PassMarket does not have the capacity

4  to dial telephone numbers or to send text messages to telephone numbers without human

5  intervention.  (*Id.*)  It is an on-demand platform.  (*Id.* ¶ 12.)  As set forth in the Participant Terms

6  of Use, which are quoted above, Twilio (the SMS message gateway provider), "███████████

7  ████████████████████████."  (Bishop SJ Decl. Ex. A at HD00026; McLean SJ Decl.

8  Ex. A at HD00026.)

9        The only other time that a customer will receive a text message is if he or she: (a) forgets

10  his or her password and seeks to create a new password; or (b) if he or she downloads the Häagen-

11  Dazs Rewards mobile application to his or her telephone number from the "App Store," in which

12  case he or she will receive a verification number sent to the telephone number that he or she

13  associates with the Rewards Program, to enter into the App to verify his or her use of the

14  telephone number.  (Bishop SJ Decl. ¶ 17; McLean SJ Decl. ¶ 20.)

15        Plaintiff has offered no contrary testimony on this issue (in the form of an expert or

16  otherwise) and in fact, Plaintiff herself has testified that she believes an ATDS was ***not*** used to

17  send her the Text.  (Pl. Dep. 67:17-21.)

18  **D.**   **<u>Neither Nestlé Nor Dreyer's Had Any Involvement In or Control of The Text</u>**

19        There is no evidence in the record that either Nestlé or Dreyer's sent a text to Plaintiff or

20  anyone else, or that either entity even had knowledge that the Text was sent.  (McLean SJ Decl. ¶

21  36.)  Plaintiff testified that she never received a text message from either entity.  (Pl. Dep. 39:4-6;

22  39:14-17.)  Neither Nestlé nor Dreyer's were parties to the PassMarket Participant Agreement.

23  (Bishop SJ Decl. Ex. A; McLean SJ Decl. Ex. A.)  Nor did either have any role in the Rewards

24  Program.  (McLean SJ Decl. ¶ 37; Declaration of Michael S. Levitz (Levitz SJ Decl.) ¶ 16, 20.)

25  **III.**

26  **<u>PROCEDURAL HISTORY</u>**

27        On May 18, 2017, Plaintiff filed the instant lawsuit in Santa Clara County Superior Court.

28  Defendants removed the case to federal court on June 16, 2017.  On July 21, 2017, Defendants

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1 | filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that it was clear from the

2 | face of the Complaint that the Text does not constitute advertising and, even if an ATDS had been

3 | used (which is not the case), Plaintiff admitted in her Complaint that she voluntarily provided the

4 | requisite level of "prior express consent." (Dkt. No. 14.)

5 | On October 11, 2017, this Court denied Defendants' motion finding Plaintiff's allegations

6 | to be sufficient at the pleading stage. (Dkt. No. 30.) Under the Court's scheduling order, the

7 | deadline to disclose experts for purposes of class certification was June 28, 2018. (Dkt. 32.) The

8 | deadline for the close of fact discovery and to serve expert designations for trial was May 31,

9 | 2019. (*Id.*) Plaintiff has not offered any expert on the issue of ATDS and is now precluded from

10 | doing so under the Court's scheduling order.

11 | **IV.**

12 | **LEGAL STANDARD**

13 | Summary judgment is warranted if "there is no genuine issue as to any material fact and

14 | the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v.*

15 | *Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Addisu v. Fred Meyer, Inc.*,

16 | 198 F.3d 1130, 1134 (9th Cir. 2000). An issue is only "'genuine'… if the evidence is such that a

17 | reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

18 | 477 U.S. 242, 248 (1986). A party opposing summary judgment must come forward with

19 | evidence that is "based on more than mere speculation, conjecture, or fantasy[,]" *Barnes v. Arden*

20 | *Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir. 1985), and "[t]he mere existence of a scintilla of

21 | evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v.*

22 | *Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). If the issue is one on which the nonmoving

23 | party must bear the burden of proof at trial, the moving party need only point out an absence of

24 | evidence supporting the claim; it does not need to disprove its opponent's claim. *Celotex Corp*,

25 | 477 U.S. at 325.

26 | **V.**

27 | **ARGUMENT**

28 | In enacting the TCPA, Congress placed restrictions on, among other things, unsolicited,

1  automated telephone calls.  The TCPA "aims to curb a particular type of uninvited call.  As a

2  result, the statute omits from its ambit those calls that a person agrees to receive."  *Fober v. Mgmt.*

3  *and Tech. Consultants, LLC*, 886 F.3d 789, 792 (9th Cir. 2018).   The FCC, which has

4  Congressional authority to prescribe rules and regulations under the TCPA, has "long interpreted

5  the TCPA to embody the principle" that a person invites a call when they "[k]nowingly release

6  their phone numbers" and have not provided "absent instructions to the contrary." *Id.* (*quoting In*

7  *re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752,

8  8769 (1992)).  Indeed, and as the Court of Appeals for the Ninth Circuit has held, "the very act of

9  turning over one's phone number demonstrates a willingness to be called" so long as the call is

10  "relate[d] to the reason why the called party provided his or her phone number is the first place."

11  *Fober*, 886 F.3d 792-93.

12       As set forth more fully below, the type of Text that Plaintiff received here, simply to

13  welcome her to the Rewards Program and to allow her to complete the enrollment (by setting up

14  her Rewards account) that she began at the Häagen-Dazs store – after she already sought to join

15  the Rewards Program and provided her cellular telephone number for that purpose – is **not** the

16  type of nuisance communication that the TCPA was designed to stop.  Nor was the Text sent with

17  the type of equipment that even triggers the restrictions imposed by the TCPA.  Because Plaintiff

18  cannot establish facts supporting her claim for violation of the TCPA, her attempt to exploit its

19  statutory recovery is without merit, and this Court should grant summary judgment to Defendants.

20  **A.      Overview of Plaintiff's Claim and the Issues Before the Court**

21       Plaintiff here asserts a single claim against three separate Defendants (Häagen-Dazs,

22  Nestlé and Dreyer's) under Section 227(b)(1)(A(iii) of the TCPA.[5]  That provision of the TCPA

23  _____

24  [5] Plaintiff alleges that "Häagen-Dazs, Dreyer's, Nestlé Holdings, Nestlé USA, and Does 1 through

25  50, with each acting as the agent for the others, with each having the legal authority to act of the

26  others' behalves, and with each ratifying the act or omission complained of herein."  (Compl. ¶

27  10.)

28

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

makes it "unlawful for any person. . . (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . (iii) to any telephone number assigned to a . . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).   "The three elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent."[6]  *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).  As to the third element, the type of consent required depends on the content of the message.  If the text message "includes or introduces an advertisement or constitutes telemarketing," the sender is required to obtain "prior express **written** consent" of the recipient. 47 C.F.R. at §§ 64.1200(a)(1) and (2) (emphasis added).  If the text message does not constitute advertising, only the provision of one's phone number is required, "so long as the call is "relate[d] to the reason why the called party provided his or her phone number." *Fober*, 886 F.3d at 792-93.

In this case, it is uncontroverted that Plaintiff voluntarily provided her cell phone number to Häagen-Dazs (thus providing "prior express consent") for the Text that she received.  She did not provide express written consent.  Accordingly, the questions before the Court are (1) whether the Text constitutes telemarketing or advertising (requiring prior express written consent) and (2) whether an ATDS was used (a threshold trigger for TCPA liability).  As set forth below, the undisputed facts pertaining to each of these questions warrant summary judgment in favor of Defendants.  As also set forth below, it is undisputed that neither Nestlé nor Dreyer's: (a) had any involvement with the Rewards Program, or the manner in which it was designed and/or utilized; and (b) had any involvement in sending the Text.  (McClean SJ Decl. ¶ 36; Levitz SJ Decl. ¶¶ 16-19-20.)  Thus, there is no basis for Plaintiffs' TCPA claim against those entities.

## B.   The Undisputed Facts Demonstrate That Plaintiff Consented to the Text

Even if an ATDS were used to send the Text, which it was not, Plaintiff's claim fails as a matter of law because she consented to receive the Text.  As set forth below, the undisputed facts

---

[6] A text message qualifies as a call under the TCPA.  *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009).

demonstrate that the Text was not advertising or telemarketing, and therefore, prior express written consent was not required.  The undisputed facts also demonstrate that Plaintiff provided prior express consent to receive the Text when she voluntarily provided her cellular telephone number to the cashier in connection with her desire to sign up for the Rewards Program.

### 1.    The Text Message Was Not Advertising or Telemarketing

When the FCC issued new rules in 2012 distinguishing between telemarketing and advertising messages as opposed to other types of messages, it defined an advertisement as "material advertising the commercial availability or quality of any property, goods, or services," and telemarketing as "the initiating of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, properly, goods or services, which is transmitted to any person.  47 C.F.R. at §§ 64.1200(f)(1) and (12).  "The TCPA is a remedial statute. *Van Patten v. Vertical Fitness Group, LLC,* 847 F.3d 1037, 1047 (9th Cir. 2017).  As such, the question of whether a message constitutes harassing advertising or telemarketing should be approached with a measure of common sense.  Federal courts agree that a call or text message does not qualify as "telemarketing" or "advertising" where the text does not directly encourage the purchase of products or services.  *See, e.g., Aderhold v. car2go N.A. LLC,* 668 F. App'x 795, 796 (9th Cir. 2016) (text "directed . . . to completing the registration process initiated by [the plaintiff] and to validating personal information" was not "telemarketing" because it did not "contain[ ] content encouraging purchase of [defendant's] services"); *Daniel v. Five Stars Loyalty, Inc.,* No. 15-cv-03546-WHO, 2015 WL 7454260, at *5 (N.D. Cal. Nov. 24 2015) (concluding that the text message at issue concerning registration for a marketing rewards program did not constitute advertising).

As the FCC has also recognized, not all text messages containing commercial information constitute advertising or telemarketing.  *Reese v. Marketron Broad. Sols., Inc.*, No. CV 18-1982, 2018 WL 2117241, at *4-5 (E.D. La. May 8, 2018) (*citing In the Matter of Rules & Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 8015 (2015) ("2015 Order").  For example, in the 2015 Order, the FCC found that a one-time text message – even if the text message includes a coupon for the consumer – does not constitute telemarketing or advertising if it was sent

1   immediately after a consumer's request."  2015 Order at 8016.  In addition, a number of district

2   courts have held that welcome messages, confirmatory messages and messages relating to a

3   product or program already purchased, or a transaction already initiated, do not rise to the level of

4   advertising or telemarketing merely because the messages contained some commercial

5   information.  *See, e.g., Suriano v. French Riviera Health Spa, Inc*., Civ. No. 19-9141, 2018 WL

6   6702749, at *5-6 (E.D. La. Dec. 20, 2018); *Smith v. Blue Shield of Cal. Life & Health Ins. Co.*,

7   228 F. Supp. 3d 1056, 1067-68 (C.D. Cal. 2017); *Wick v. Twilio Inc.*, No. 16-914, 2016 WL

8   6460316, at *3 (W.D. Wash. Nov. 1, 2016).

9   In *Smith*, for example, the court distinguished telemarketing calls from the defendant's

10   messages based on the "informative nature of [the] messages."  228 F. Supp. 3d at 1066.  The

11   defendant's messages notified recipients that they would receive additional information.  Although

12   the defendant's "website contains the capability of allowing consumers to engage in commerce,"

13   the Court held that this "does not transform any message including its homepage into

14   telemarketing or advertising."  *Id*. at 1067.

15   In *Wick*, the plaintiff provided his cellphone number and other information in order to

16   obtain a free sample from a website.  2016 WL 6460316, at *1 ("Immediately after submitting his

17   information, plaintiff received a text message stating: 'Noah, Your order at Crevalor is incomplete

18   and about to expire. Complete your order by visiting http://hlth.co/xDoXEZ.'")  When the court

19   held that this message did not constitute telemarketing, it noted that the message "related solely to

20   the consumer transaction [plaintiff] had initiated," and did not "offer[ ] or encourage[ ] the

21   purchase of any product other than the free sample for which plaintiff submitted his information."

22   *Id.* at *3.

23   In *Suriano*, the court was confronted with text messages about various offerings at a health

24   club, but held they were not advertising in the context of the plaintiff's transaction with the health

25   club.  There, the plaintiff had signed up for a health club membership and personal training

26   sessions.  It was "undisputed that the plaintiff provided his cell phone number to defendant (thus

27   providing express consent), but that he did not provide express *written* consent."  2018 WL

28   6702749 at *3 (emphasis in original).

Based on these messages, the plaintiff filed a TCPA class action.  As is the case here, on the defendant's dispositive motion, the issue before the court was "whether the text messages in question are telemarketing or adverting, requiring express written consent, or informational messages, which do not."  *Id.*  The court in *Suriano* held that each of the texts did not constitute advertising and dismissed the plaintiff's claims:

> At the outset, messages one, two, and five are plainly informational in nature.  The first (sent the day after plaintiff joined) welcomes him to the gym; the second provides a link to classes and group training schedules, and the fifth informs him of a blog containing workout tips and testimonials.  Accordingly, plaintiff's provision of his cell phone number constitutes express consent to receive these informational messages which relate to his provision of his number to defendant: he provided the number in joining the gym, and the messages provide information on gym amenities or activities.
>
> The third message, 'Dear member, Become your best self with our Personal Trainers. Ask us for info on our PT program. (http://tinyurl.com /yc8zaep8),' could in some contexts constitute advertising; however, at the time plaintiff received this message, he had already joined the gym and signed up for six months of personal training services.  The message merely encouraged plaintiff to take advantage of the personal training services for which he already paid, and thus, it too, may fairly be classified as informational.   Express written consent was therefore not necessary.
>
> The final message complained of by plaintiff reads: 'Follow us on social media! Facebook        (http://tinyurl.com/        Y8m7okwe)        Instagram (http://tinyurl.com/y77ocpjh).'  Again, defendant argues that this is merely informational, inviting plaintiff to join the on-line/social media community of the gym of which he is already a member. While defendant's Facebook and Instagram sites in all likelihood do have a promotional aspect, the message in question falls outside of the regulatory definition of advertising and telemarketing.  An invitation to visit a social media site is not material which specifically advertises 'the commercial availability or quality of any property, goods, or services,' nor does it constitute 'the initiation of a ... message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services....' Accordingly, this final message also did not require express written consent.

*Id.*

Pertinent to the context of the Text in this case, in *Daniel*, the court held that a text message did not constitute advertising or telemarketing simply because it related to a customer loyalty program and mentioned earning free loyalty points.  In determining that the text message at issue was not telemarketing or advertising, the court considered that the "single text message [was] in direct and immediate response to [the plaintiff's] inquiry regarding the Five Stars program and to his provision of his phone number."  The text message did not urge him to "redeem" Five Stars points, nor did it reference any shopping or purchasing.  2015 WL 7454260 at

1    *5.

2         Here, Plaintiff admitted at her deposition that the Text did not encourage the purchase of

3    Häagen-Dazs products, property, goods or services.  (Pl. Dep. 45:20-24 (testifying the Text did not

4    try to "sell her anything").)  Plaintiff also admitted that she received the Text "shortly" after she

5    provided her phone number to the Häagen-Dazs cashier in response to the invitation to join the

6    Rewards Program.  This context demonstrates that the purpose of the Text was to welcome

7    individuals, like Plaintiff, who wanted to join the Rewards Program so that they could complete

8    the enrollment process by downloading the App, which would allow them to enjoy the full

9    experience of the Rewards Program.  (McLean SJ Decl. ¶¶ 10, 30; Bishop SJ Decl. ¶ 10.)  As

10   Plaintiff admitted at her deposition, neither the Text nor the App contained advertising.  (Pl. Dep.

11   48:17-19.)  There is no evidence in the record that the Text "encourage[ed] the purchase" of any of

12   Defendants' goods or services.  It, therefore, does not qualify as telemarketing or advertising

13   sufficient to trigger the written consent provisions of the TCPA.

14        The undisputed facts also demonstrate that the Rewards Program is App-based, and the

15   purpose of the Text was to allow consumers who had voluntarily joined the Rewards Program to

16   complete their enrollment by accessing the App, creating a password, and entering some

17   additional information related to their membership in the Rewards Program.  The Text did not

18   advertise any product or service, nor could it be viewed as an enticement to join the Rewards

19   Program itself because Plaintiff admits that she had already desired to join it.  The App also does

20   not allow a customer – including Plaintiff – to purchase anything through it.  (McLean SJ Decl. ¶

21   35.)  The App itself is not a commercial product offered by Häagen-Dazs, nor does Häagen-Dazs

22   sell the App to anyone.  (McLean SJ Decl. ¶¶ 32-34.)  Instead, the App includes information

23   concerning locations of Häagen-Dazs stores, the rewards points earned, and coupons and discounts

24   that may be available.  (McLean SJ Decl. ¶ 30.)

25        Even if the Text was for the simple purpose of welcoming plaintiff to the Rewards

26   Program, or providing easy access to the App – which relates to a Rewards Program that Plaintiff

27   had already voluntarily asked to join – that does not convert the Text into advertising or

28   telemarketing.  *See Car2go,* 668 F. App'x at 796.  The fact that a text message contains a link to a

website or a mobile application does not convert the text message into advertising or telemarketing, even if the website or app itself contains commercial information.[7]  For example, in *An Phan v. Agoda Company Pte. Ltd.*, the court squarely concluded that a text to a customer confirming a travel booking that also included a link to download an app did not constitute telemarketing or advertising.  351 F. Supp. 3d 1257 (N.D. Cal. 2018).  In that case, although the booking was complete before the text message at issue was sent, the court granted summary judgment because "[t]he inclusion of the link to the app is not enough to warrant holding that these messages were advertising under the TCPA. Though the app may fairly be considered a product or service of [defendant], the messages simply cannot be said to advertise the commercial availability of this product or service under the law."  *Id.* at 1266.

---

[7] To the extent Plaintiff attempts to argue that downloading the App might somehow ultimately lead to purchases at Häagen-Dazs, courts have rejected such attenuated theories.  *Knutson v. Blue Light Security, Inc.*, No.17-cv-134-LAB, 2018 WL 1172611, at *4 (S.D. Cal. Mar. 8, 2018) (call was not advertising where "[t]he regulation's wording makes plain that it is aimed at calls that include or introduce advertisements, or constitute telemarketing, and not calls that are related in some attenuated way to advertising or telemarketing the caller intends to conduct in the future"); *MacKinnon v. Hof's Hut Restaurants, Inc.*, No. 2:17–cv–01456–JAM–DB, 2017 WL 5754308 (E.D. Cal. Nov. 28, 2017) (dismissing claim where text reflected a reservation confirmation and included a link to view specials available that night); *Daniel*, 2015 WL 7454260, at *5 ("Given the context of the message, that brief reference [of free points] does not rise to the level of encouraging the purchase of goods or services. Nor does it threaten the sort of 'intrusive invasion of privacy' that Congress contemplated in enacting the TCPA.") (citing *Mims*, 132 S. Ct. at 745); *Aderhold v. Car2go N.A., LLC*, No. C13-489RAJ, 2014 WL 794802, at *9 (W.D. Wash. Feb. 27, 2014), *aff'd*, 668 F. App'x 795 (9th Cir. 2016) (rejecting argument that text regarding registration process constituted advertising).

1         The court in *Mackinnon* came to the same conclusion, albeit in a somewhat different

2   scenario.  2017 WL 5754308, at *1.  In that case, the plaintiff made a dinner reservation at the

3   defendant restaurant and provided his phone number to receive confirmation of the reservation.

4   *Id*.  The defendant sent him a text message that confirmed the reservation and provided a link to

5   "view specials."  *Id.*  The court there held that the text message was not advertising or

6   telemarketing because it "only served to confirm an expected commercial transaction (eating at

7   Defendant's restaurant) that Plaintiff had initiated."  *Id.* at *2 (citing *Daniel* and *Wick*).  The

8   inclusion of the link to view specials did not make the message advertising because it merely

9   "facilitated Plaintiff's dining transaction by allowing him to view specials on his cellphone before

10  sitting down to dinner." *Id.*

11        The court in *Reese* reached a similar result, 2018 WL 2117241, at *4-5.  There, the

12  plaintiff alleged that she received unwanted text messages from Marketron after entering a contest

13  to win free tickets to a performance by the artist Tinashe.  Plaintiff claims she heard about the

14  contest on a radio broadcast and sent a text containing a key word ("joyride") to an SMS short

15  code used by Marketron.  Marketron then sent the following messages to plaintiff:  *"Power129:*

16  Ur entered 2 win TINASHE@HOBtix! More txts=more changes! Reply POWER to join Buy tix:

17  bit.ly/tinasheKKND."  The "bit.ly/tinasheKKND" link led to a website that allegedly sold concert

18  tickets.  Relying on *Wick*, the court found that this text message did not rise to the level of

19  advertising or telemarketing as defined by the TCPA, finding as follows:

20      Under some circumstances, Marketron's first message could be construed as
        'advertising the commercial availability ... of [a] service[ ].' 47 C.F.R. at §
21      64.1200(f)(1). But plaintiff already knew about the availability of tickets to the
        concert.  Like the message in *Wick*, Marketron's first text message related solely to
22      the concert for which plaintiff desired free tickets, and did not encourage the
        purchase of tickets for any other concert.  Although the linked website allegedly
23      offered tickets for other concerts in the New Orleans area, this alone does not
        transform Marketron's message into telemarketing.
24
        * * *
25      [The] timing [of the text message] further supports the "informative nature" of
        Marketron's first text message.  .  .  .  Because of the informative nature of the
26      message, the Court holds that Marketron's first text message to plaintiff did not rise
        to the level of advertising or telemarketing under 47 C.F.R. at § 64.1200.
27
          The same result should be reached here, where the record is undisputed that the Text did
28
    not attempt to sell Plaintiff anything.  Plaintiff's admission that the Text did not attempt to sell her

18

anything, by itself, is enough for this Court to find that the Text is not advertising or telemarketing. *See, e.g., Alleman v. Yellowbook*, No. 12-cv-1300-DRH-PMF, 2013 WL 4782217, at *4-7 (S.D. Ill. Sept. 6, 2013) (phone message "did not promote or advertise any product for sale" and noting "[o]n its face, the call is not part of a marketing campaign to sell additional products"); *Friedman v. Torchmark Corp.*, No. 12-CV-3827-IEG (BGS), 2013 WL 1629084, at *4-5 (S.D. Cal. Apr. 16, 2013) (defendant's calls to plaintiff regarding recruiting webinar concerning opportunity for plaintiff to earn money was not an "advertisement" because it did not encourage purchase of property, goods, or services); *Ibey v. Taco Bell Corp.*, No. 12-CV-0583-H (WVG), 2012 WL 2401972, at *3 (S.D. Cal. June 18, 2012) (dismissing TCPA claim noting, "Defendant's single, confirmatory text message did not constitute unsolicited telemarketing; Plaintiff had initiated contact with Defendant").

### 2. Plaintiff's Admission That She Provided Prior Express Consent To Receive The Text Message At Issue Is A Bar To Her Claim

As this Court previously recognized, "a text or call that does not include or introduce an advertisement or constitute telemarketing may be sent with 'prior express consent.'" *San Pedro-Salcedo v. Häagen-Dazs Shoppe Company, Inc.*, No. 5:17-cv-03504, 2017 WL 4536422, at *2 (N.D. Cal. Oct. 11, 2017). The Ninth Circuit has recently reaffirmed the long-standing precept that "prior express consent" is satisfied by a consumer's provision of his or her cell phone number, so long as instructions to the contrary have not been provided and so long as the call/text at issue relates to the context in which the number was provided. *Fober*, 886 F.3d at 792-93; *see also Car2go N.A., LLC*, 2014 WL 794802, at *4-6, *quoting In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, Report and Order*, 7 F.C.C. Rcd. 8752, 8769 (Oct. 16, 1992); 2015 Order, 30 F.C.C. Rcd. 7961, 7991 ("[E]xpress consent can be demonstrated by the called party giving prior express oral or written consent or, in the absence of instructions to the contrary, by giving his or her wireless number to the person initiating the autodialed or prerecorded call.").[8]

---

[8] In addition, the FCC has found that a one-time text, even one that includes a coupon, is not telemarketing or advertising if it responds to a consumer's request for the coupon or information.

(footnote continued)

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

For example, as the district court observed in *Van Patten*, the plaintiff provided his phone number upon joining the gym, but cancelled his membership soon thereafter. *Van Patten v. Vertical Fitness Group*, 22 F. Supp. 3d 1069, 1071 (S.D. Cal. 2014). There was no dispute that the plaintiff:

> never actually said to Vertical Fitness, 'Yes, you may text me at the number I have given you,' or anything like that. He never signed his name or initialed next to a disclaimer that by providing his phone number to Vertical Fitness he was welcoming text messages. As the Court said above, when [the plaintiff] joined the Gold's Gym, the subject of text messages never came up. . . . [The plaintiff] simply provided his phone number on an application card with no discussion of why Gold's Gym needed it or what they would do with it.

*Id.* at 1073. The Ninth Circuit, nevertheless, agreed with the district court that prior express consent was satisfied. *Van Patten*, 847 F.3d at 1048 (affirming summary judgment in favor of defendant); *see also Pinkard v. Wal-Mart Stores, Inc.*, No. 3:12-cv-2902-CLS, 2012 WL 5511039, at *2 (N.D. Ala. Nov. 9, 2012) (concluding that "providing her cellular telephone number to defendant was 'clear and unmistakable' consent to be contacted at that number" even where no one from Wal-Mart discussed that plaintiff would receive text messages with her).

Here, the record is undisputed that Plaintiff provided her prior express consent. Plaintiff received a text message right after seeking to join the Rewards Program and after voluntarily providing her cell phone number. (Compl. ¶ 13; Pl. Dep. 43:16-23.) The content of the Text is directly related to the circumstances under which Plaintiff provided her cell phone number. Thus, even if an ATDS were used to send the Text (which it was not), Plaintiff's claim should be dismissed because she provided the requisite level of consent to receive the Text.

## C.     The Undisputed Facts Demonstrate That Häagen-Dazs Did Not Use an ATDS to Text Plaintiff

The Ninth Circuit recently addressed the statutory definition of an ATDS and concluded that the definition includes (1) "a device that stores telephone numbers *to be called*, or (2) to

---

(footnote continued)
*See July 2015 FCC Order,* 30 F.C.C. Rcd. 7961, 8015-16 at ¶¶ 103-106.

1    produce numbers to be called, using a random or sequential number generator." *Marks v. Crunch*

2    *San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018) (emphasis added).   The Ninth Circuit

3    further held that to qualify as an ATDS, the device must be able to dial stored numbers

4    "automatically," *i.e.,* without human intervention.   *Id.* at 1052.   This Court has granted summary

5    judgment in a similar situation where the plaintiff has failed to establish that the calls alleged in

6    the complaint were made using an ATDS.   *Ellis v. Phillips and Cohen Associates, Ltd*., No. 14-cv-

7    05539-EJD, 2016 WL 3566981, at *6-7, (N.D. Cal. Jun. 30, 2016).   Similar to the calls alleged in

8    *Ellis*, the Text at issue in this case was sent manually.   The record evidence in this case makes

9    clear that the platform at issue fails to satisfy every possible ATDS requirement; accordingly,

10   summary judgment in Defendants' favor is proper.

11              **1.       The Platform Does Not Generate or Store Numbers To Be Called**

12            In *Marks*, the Ninth Circuit made clear that in order for a device to qualify as an ATDS, it

13   must either produce numbers through a random or sequential generator or store numbers to be

14   called.   904 F.3d at 1053.   The record evidence in this case is unequivocal that the platform that

15   was used cannot perform either function.

16            First, the platform does not generate numbers randomly or sequentially.   (Bishop SJ Decl.

17   ¶ 18.)   Häagen-Dazs only obtains customer cellular telephone numbers when the customer

18   voluntarily provides his or her phone number to a Häagen-Dazs cashier, who then manually types

19   the number into the Häagen-Dazs POS.   (Bishop SJ Decl. ¶¶ 12-14; McLean SJ Decl. ¶ 17.)

20   Second, the platform does not store numbers to be called.   (Bishop SJ Decl. ¶ 18.)   Neither the

21   Häagen-Dazs POS nor the PassMarket platform stores numbers for calling (or texting).[9]   (McLean

22   _____

23   [9] While PassMarket maintains a record of the telephone number provided by a customer for

24   purposes of tracking rewards, it has no ability to call or text those numbers after the single

25   transmission from the Häagen-Dazs POS to PassMarket to Twilio.   (Bishop SJ Decl. ¶ 19.)   In

26   fact, when Plaintiff sought a record of all numbers to which Haagen-Dazs sent text messages,

27   iMobile3 had no ability to produce such records.   Instead, iMobile3 made this request of Twilio.

28

                                                     (footnote continued)

SJ Decl. ¶ 23, Ex. A at HD00026; Bishop SJ Decl. ¶ 17, Ex. A at HD00026.)  Instead, phone numbers were maintained solely for the purpose of tracking rewards accumulated by a Rewards Member.  (McLean SJ Decl. ¶ 24.)  Indeed, the Ninth Circuit recently held that where, as here, a platform stores numbers for identification purposes for a rewards program, the system does not satisfy the "to be called" provision of the TCPA.  *Duguid v. Facebook, Inc.*, ---F.3d ----, 2019 WL 2454853, at *5 (9th Cir. June 13, 2019) (noting that "[p]hone numbers are frequently stored for purposes other than 'to be called': shops and restaurants store numbers to identify customers in their loyalty programs . . .")  Nor does Twilio (effectively the telecommunications provider here) store numbers to be called.  (Bishop SJ Decl. ¶ 21.)  Twilio only maintains a historical record of the numbers texted or called (just as a traditional telecommunications provider would), but it has no ability to itself send additional text messages or place calls to those numbers.  (Bishop SJ Decl. ¶ 22.)

Where, as here, the platform does not generate numbers randomly or sequentially, and does not store numbers to be called (or texted), summary judgment is proper.  *Marks*, 904 F.3d at 1052.

**2.    The Platform At Issue Here Cannot Dial Numbers Automatically**

It is also undisputed that the platform cannot dial numbers "automatically," as the Ninth Circuit held in *Marks* is required to qualify as an ATDS.[10]  904 F.3d at 1052.  As set forth above, the platform used here works only as an "on-demand."  (Bishop SJ Decl. ¶¶ 12-16; McLean SJ Decl. ¶¶ 16.)  The record is clear that it can (i) only send a single text message at a time; (ii) when the Häagen-Dazs cashier initiates a text by entering the number into the Häagen-Dazs POS. (Bishop SJ Decl. ¶¶ 16-19; McLean SJ Decl. ¶¶ 11-15.)

---

(footnote continued)

Twilio provided data that iMobile3 then had to code to create a list for the purpose of this action only.  (Bishop SJ Decl. ¶¶ 20-21.)

[10] Because the defendant in *Marks* did "not dispute that the . . . system dials numbers automatically," the Ninth Circuit did not address the precise level of human intervention required for a device to fall outside the statutory definition of ATDS.  904 F.3d at 1053.

Courts have previously granted summary judgment on the basis of similar facts where action by a human being was required to initiate a text message. *See Huricks v. Shopkick, Inc.,* No. C-14-2464 MMC, 2015 WL 5013299, at *3 (N.D. Cal. Aug. 24, 2015) (granting summary judgment for defendant because message transmission required a person to select recipients and affirmatively choose to send text message); *Luna v. Shac, LLC*, 122 F. Supp. 3d 936, 941-42 (N.D. Cal. 2015) (granting summary judgment for defendant because "human intervention was involved in drafting the message, determining the timing of the message, and clicking "send" on the website to transmit the message [at issue]"); *Glauser v. GroupMe, Inc.*, No. C 11-2584 PJH, 2015 WL 475111, at *6 (N.D. Cal. Feb. 4, 2015) (granting summary judgment for defendant because "application reacted entirely to actions by . . . members, and never sent messages without human intervention.")

Other courts have likewise held that a high degree of human involvement, such as the human involvement required here, removes a system from the statutory definition of an ATDS. *See, e.g., Herrick v. GoDaddy.com LLC*, 312 F. Supp. 3d 792, 802 (D. Ariz. 2018) (granting summary judgment in favor of defendant because a user "had to . . . log into the system, create a message, schedule a time to send it . . . As such, the text was not sent automatically or without human intervention and thus was not sent using an autodialer, as that term is defined under the TCPA"); *Marshall v. CBE Grp., Inc.*, No. 2:16-cv-02406-GMN-NJK, 2018 WL 1567852, at *6-7 (D. Nev. March 30, 2018) (granting summary judgment for defendant on ATDS issue because defendant's agent made calls via manual clicker application); *Ung v. Universal Acceptance Corp.*, 249 F. Supp. 2d 985, 989-91 (D. Minn. 2017) (granting summary judgment for defendant based on the "critical component" of human intervention because a "live human being was required to place calls . . . This is not, to parrot the FCC, a system providing a way to 'dial thousands of numbers in a short period of time.'"); *Glasser v. Hilton Grand Vacations Co., LLC*, 341 F. Supp. 3d 1305, 1312-14  (M.D. Fla. 2018) (granting summary judgment for defendant where employees had to select a "make a call" button before placing a call because "[t]he basic function and defining characteristic of an ATDS is 'the capacity to dial numbers without human intervention.'"); *Maddox v. CBE Grp., Inc.*, No. 1:17-CV-1909, 2018 WL 2327037, at *3-5 (N.D. Ga. May 22,

1  2018) (granting summary judgment for defendant on TCPA claim because call could not be made

2  without defendant's agents using a manual clicker application).

3      In *Duran v. La Boom Disco, Inc.,* 369 F. Supp. 3d 476 (E.D.N.Y. 2019), the court denied

4  Plaintiff's motion for summary judgment and granted summary judgment for defendant *sua*

5  *sponte*, based upon the level of human intervention required to send text messages.  *Id.* at 490.

6  The court concluded that, consistent with the Ninth Circuit's ruling in *Marks*, it did not read the

7  definition of ATDS "as requiring random or sequential number generation," and therefore did not

8  "find that the programs' reliance on a database of numbers" removed them from the scope of the

9  TCPA.  *Id.* at 490 However, the court concluded that the systems "do not qualify as autodialers

10 because they are not capable of dialing numbers without human intervention."  *Id.*  In *Duran*,

11 human intervention was required to determine the date and time to send a message, as well as to

12 enter or upload the numbers into the system.  *Id.*  Likewise, the record here is undisputed that the

13 single Text was sent when the Häagen-Dazs cashier manually entered Plaintiff's telephone number

14 into the POS after Plaintiff voluntarily provided it.  This manual process removes the platform

15 from the purview of the TCPA.

16     This conclusion is further supported by Plaintiff's concession at her deposition that she did

17 not believe that Häagen-Dazs used an ATDS to text her.  (Pl. Dep. 67:17-21.)  As her basis for this

18 belief, Plaintiff stated that she received the Text shortly after providing her phone number, *i.e.*,

19 after the cashier initiated the text message by entering Plaintiff's number into the Häagen-Dazs

20 POS.  (*Id.*)  (Bishop. SJ Decl. ¶ 16.)  Accordingly, Plaintiff's own testimony and experience is

21 entirely consistent with the fact that the platform was an "on-demand" platform, and not an ATDS.

22 *Ramos v. Hopele of Fort Lauderdale, LLC,* 334 F. Supp. 3d 1262, 1275 (S.D. Fla. 2018) (text

23 program used by defendant "was not an ATDS" because "no text message would have been sent"

24 if defendant "had not ultimately pressed 'send' to authorize the . . . platform to send the text

25 message").  Thus, her claim should be dismissed.

26 **D.   Nestlé and Dreyer's Are Entitled to Summary Judgment**

27     As set forth above, summary judgment in favor of all Defendants is proper.  However,

28 where, as here, there is no evidence in the record that either Nestlé or Dreyer's were involved

1   with, controlled, or were even aware of the Text that was sent to Plaintiff, summary judgment on

2   Plaintiff's claims against them is also warranted on this independent ground.  In fact, neither entity

3   played any role in sending any text message in connection with the Rewards Program.  (McLean

4   SJ Decl. ¶¶ 36-37; Levitz SJ Decl. ¶¶ 16-17, 19-20.)  Plaintiff alleged claims against "Defendants"

5   in conclusory fashion (Compl.   ¶¶ 5, 15-16, 19-21), but failed to specify the role that each

6   Defendant purportedly had in sending the Text.  The only allegations against Nestlé and Dreyer's

7   are that these entities own Häagen-Dazs and market its products. (Compl. ¶¶ 11-12.)   These

8   allegations are insufficient to maintain a claim against these entities.  *See, e.g.*, *Ewing v. Encor*

9   *Solar, LLC*, No. 18-CV-2247-CAB-MDD, 2019 WL 277386, at *7 (S.D. Cal. Jan. 22, 2019)

10  (dismissing complaint where the plaintiff "failed to adequately allege the first element of a TCPA

11  claim, namely that [the defendant], or an agent acting on its behalf, called a telephone number

12  belonging to" the plaintiff).  Discovery has not produced a shred of evidence concerning the

13  involvement of these entities in sending the Text.  Accordingly, in addition to the grounds set forth

14  above, summary judgment in favor of Nestlé and Dreyer's is also warranted.

### CONCLUSION

15

16          For all of the reasons discussed above, Defendants respectfully request that the Court grant

17  their motion for summary judgment and dismiss Plaintiff's claim.

18  DATED: July 9, 2019                          KELLEY DRYE & WARREN LLP

19

20                                              By:    /s/ Tahir L. Boykins
                                                Tahir L. Boykins
21                                              Attorneys for Defendants
                                                *The Häagen-Dazs Shoppe Company, Inc.,*
22                                              *Nestlé Dreyer's Ice Cream Company and*
                                                *Nestlé USA, Inc.*